IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KAREN A. WALTERS,                    )
                                     )
                 Plaintiff,          )
                                     )
                                     )    Civil Action No. 06-1355
          v.                         )
                                     )
                                     )
WASHINGTON COUNTY;                   )
WASHINGTON COUNTY COURT OF           )
COMMON PLEAS; HONORABLE              )
DEBBIE O'DELL SENECA;                )
INDIVIDUALLY AND IN HER              )
CAPACITY AS PRESIDENT JUDGE          )
OF THE WASHINGTON COUNTY             )
COURT OF COMMON PLEAS;               )
WASHINGTON COUNTY DOMESTIC           )
RELATIONS OFFICE; CATHI KRESH,       )
INDIVIDUALLY AND IN HER              )
CAPACITY AS DIRECTOR OF              )
WASHINGTON COUNTY DOMESTIC           )
RELATIONS; JEANIE RYDZAK,            )
INDIVIDUALLY AND IN HER              )
CAPACITY AS CLERICAL                 )
SUPERVISOR, IN WASHINGTON            )
COUNTY DOMESTIC RELATIONS            )
OFFICE; AND TOM JESS                 )
INDIVIDUALLY AND IN HIS              )
CAPACITY AS DEPUTY COURT             )
ADMINISTRATOR OF WASHINGTON          )
COUNTY,                              )
                                     )
                 Defendants.         )


**<u>MEMORANDUM OPINION</u>**

CONTI, District Judge.

Pending before this court are the motion for summary judgment (Docket No. 57) filed by

defendants Washington County ("County"), Cathi Kresh ("Kresh"), Jeanie Rydzak ("Rydzak"),

and Tom Jess ("Jess") and the motion for summary judgment (Docket No. 61) filed by defendants the Honorable Debbie O'Dell Seneca ("Judge O'Dell Seneca"), Washington County Court of Common Pleas ("Court of Common Pleas") and Washington County Domestic Relations Office (individually "Domestic Relations Office" and together with Judge O'Dell Seneca and the Court of Common Pleas, "Judicial Defendants").  Plaintiff Karen A. Walters ("Walters" or "plaintiff") filed this civil action asserting claims 1) for age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA"), and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. §§ 951 *et seq.* ("PHRA"), 2) for retaliatory suspension/discharge under Pennsylvania law, and 3) for deprivation of due process without pre- or post-deprivation hearing under 42 U.S.C. § 1983.  Plaintiff also filed a claim for intentional infliction of emotional distress which was dismissed on May 24, 2007, along with the individual claims against Kresh, Rydzak, and Jess under the ADEA.  (Docket No. 37.)  A claim was also made against SEIU 88, a union, for breach of a duty of fair representation or misrepresentation.  Plaintiff, however, stipulated to the dismissal of SEIU 88 as a defendant from this action on April 4, 2008. (Docket Nos. 51, 53, 54.)  Plaintiff initially filed these claims with the Equal Employment Opportunity Commission ("EEOC") and cross-filed with the Pennsylvania Human Rights Commission ("PHRC").  Both agencies dismissed the claims and issued right to sue letters.

After reviewing the record, considering the briefs in support of and in opposition to the motions, viewing all disputed facts in plaintiff's favor and drawing all reasonable inferences in plaintiff's favor, the court concludes that no reasonable finder of fact could render a verdict for plaintiff on her federal claims.  With respect to the claims asserted by plaintiff under the ADEA,

the court concludes that plaintiff failed to establish that defendants' legitimate nondiscriminatory reasons were pretextual. With respect to the claims asserted by plaintiff under § 1983, the court concludes that plaintiff failed to establish that she had a property interest in her employment. Finally, the court declines to exercise supplemental jurisdiction over plaintiff's state law claims. Accordingly, the court will grant summary judgment in favor of defendants with respect to plaintiff's federal claims and will dismiss the state claims without prejudice.

**Factual Background**

In August 1992, plaintiff was hired by the domestic relations section of the Court of Common Pleas. (Deposition of Walters, Sept. 21, 2007 ("Walters Dep."), Docket No. 59, Ex. A at 36.) Plaintiff was employed in the section from August 19, 1992 through October 18, 2004. (Affidavit of Walters, Sept. 25, 2008 ("Walters Aff."), Docket No. 68, Ex. J ¶ 1.) Plaintiff initially started as a stenographer, but eventually became a clerk-typist II in the domestic relations office. (Walters Dep. at 38.) Her duties included dictating child support hearings, scheduling genetic testing, typing up and mailing out court orders, answering phones, waiting on customers, and collecting child support payments from customers. (Walters Dep. at 39-41; Deposition of Kresh, Dec. 7, 2007 ("Kresh Dep."), Docket No. 59, Ex. B at 40-41.)

Although plaintiff was hired by the Court of Common Pleas, she specifically recalled County representatives having significant input in her hiring process. (Walters Aff. ¶ 2.) Plaintiff averred that she learned about the opportunity through the County human resources department and filled out a County application. (Id.; Washington County Application of Employment, Docket No. 68, Ex. K; Authorization for Criminal Background Check, Docket No.

68, Ex. L.)  She also claimed that she was interviewed by Janice Urban ("Urban"), the assistant

director of the County's human resources office, and Urban administered her a typing test and

personally informed her that she was hired.  (Walters Aff. ¶ 2.)  Washington County

employment/training documentation exists for plaintiff dating from 1992.  (County of

Washington Employment/Training Documentation, Docket No. 68, Ex. N.)

Plaintiff signed an acknowledgment that she had been informed about the County phone

policy, agreed to abide by the County weapons and contraband policy, acknowledged in writing

that she received a copy of the County's sexual harassment policy, and acknowledged in writing

that she received a copy of the County's equal opportunity policy and discrimination complaint

process policy.  (Washington County Phone Policy Acknowledgment, Docket No. 68, Ex. P;

Washington County and Contraband Acknowledgment, Docket No. 68, Ex. Q; Sexual

Harassment Policy Acknowledgment, Docket No. 68, Ex. R; Equal Employment Opportunity

Policy and Discrimination Complaint Policy Acknowledgment, Docket No. 68, Ex. S.)[1]  Plaintiff

believed that she was covered by the County's sexual harassment policy and other personnel

policies, and that her wage rates and benefits were governed by the collective bargaining

agreement to which the County was a party.  (Walters Aff. at ¶ 3.)  Plaintiff alleged that her

identification card was supplied by the County.  (Walters Aff. ¶ 6.)  Kresh testified that she had

referred plaintiff, as well as other County employees, to the County's employee assistance

---

1  Plaintiff provided a letter pertaining to a dress code violation by an employee of the Washington County
Prothonotary's office.  The County stated that the prothonotary would be entitled to defense and indemnification
from the County for an employment action.  The prothonotary's office in any county is, however, treated differently
from a domestic relations section of the Court of Common Pleas.  The court does not find this evidence to be
material.

program.  (Kresh Dep. at 36.)  Plaintiff was paid by the County.  (Wage Tax Withholding Questionnaire, Docket No. 68, Ex. M.)

Court of Common Pleas' employees could bring a union representative to meetings regarding discipline or counseling.  (Kresh Dep. at 20.)  Domestic relations employees were afforded the right to union representation when being disciplined or otherwise accused of wrongdoing, and the union regularly filed grievances on behalf of "court" employees under the supervision of deputy court administrator Jess.  (Deposition of Jess ("Jess Dep."), Docket No. 59, Ex. C at 46-47, 73.)  Jess testified that prior to his tenure as deputy court administrator, the Court of Common Pleas participated in the grievance process.  (Jess Dep. at 78.)

Plaintiff's immediate supervisor in domestic relations was Rydzak. (Walters Dep. at 43.)  Above Rydzak were Kresh, director of domestic relations, Jess, deputy court administrator, and Christine Weller ("Weller"), court administrator.  (Walters Dep. at 43-46; Kresh Dep. at 19.)  Rydzak and Kresh controlled plaintiff's day-to-day work activities.  (Walters Dep. at 45-46.)  Rydzak set plaintiff's hours and set the guidelines, policies, and practices of plaintiff's employment. (Walters Dep. at 48-49.)  If plaintiff wished to take a vacation or personal day, she had to make the request to Rydzak or Kresh.  (Walters Dep. at 45-46.)  Plaintiff's superiors in the domestic relations section were responsible for disciplining domestic relations employees. (Walters Dep. at 47.)

During her employment in the domestic relations section, plaintiff was disciplined multiple times by her superiors for alleged misbehavior.  In November 1993, plaintiff was issued a verbal warning by the domestic relations director Sue Accetta ("Accetta") for alleged insubordination and failing to complete timely work assignments.  (11-30-93 Verbal Warning,

Docket No. 59, Ex. E, Walters Dep. at 52-55.)  In December 1995, Accetta suspended plaintiff for two days without pay for unprofessional conduct in a meeting.  (12-5-95 Suspension Letter, Docket No. 59, Ex. F; Walters Dep. at 55-57.)  In August 1999, domestic relations deputy director Martha Ward suspended plaintiff for five days without pay and put her on six months probation for modifying a signed court order without permission.  (8-10-99 Suspension Letter, Docket No. 59, Ex. G.)  In that instance, Judge O'Dell Seneca had signed a court order that plaintiff believed was incorrect.  (Walters Dep. at 58-61.)

When asked whether she was suspended in 1995 for unprofessional behavior, plaintiff remembered being suspended.  She did not remember the reason for the suspension, stating "I don't know what it was.  Something they said that I probably did.  I always got picked on. Constantly.  It was like verbal abuse." (Id. at 55-56.)

In 2004, soon after Kresh took over the office, she had a meeting with plaintiff to discuss her attendance and use of the telephone for personal calls.  (Kresh Dep. at 35-36.)  In February 2004, Kresh, Rydzak, and Jess had another meeting with plaintiff because, allegedly, plaintiff's work habits and attitude toward her superiors had not improved. (Kresh Dep. at 37-38; Memorandum of Jess regarding plaintiff, Docket No. 59, Ex. H; Memorandum of Rydzak, Docket No. 59, Ex. I.)  Plaintiff denied that she had been rude.  (Memorandum of Jess regarding plaintiff, Docket No. 59, Ex. H.)  Following this meeting, Kresh gave plaintiff a letter of counseling that instructed plaintiff to focus more on her job duties and also show more respect to her superiors.  (4-23-04 Letter of Counseling, Docket No. 59, Ex. J; Kresh Dep. at 37-40; Walters Dep. at 70-74.)

In April 2004, plaintiff was given additional training because she was unable to consistently mail out timely and correct court orders. (4-29-24 Acknowledgment of Training, Docket No. 59, Ex. K;  Kresh Dep. at 39-40; Walters Dep. at 74-75.)  In July 2004, Kresh gave plaintiff another reprimand because plaintiff refused to accept a child support payment during the lunch hour even though domestic relations policy expressly provided that payments should be accepted and processed during that period.  (7-8-04 Written Reprimand, Docket No. 59, Ex. L; Walters Dep. at 76-77.)  Kresh reprimanded plaintiff for having food delivered to the front desk even though there was a domestic relations office policy against that practice.  (7-8-04 Written Reprimand, Docket No. 59, Ex. L.)  Plaintiff denied that these incidents occurred as they were reported.  (Walters Dep. at 77.)  In September 2004, Jess suspended plaintiff for three days without pay for insubordination and failure to perform sufficiently her job duties.  (9-17-04 Suspension Letter, Docket No. 59, Ex. M; Walters Dep. at 78.)  Plaintiff had mailed out a court order to the wrong person and this was brought to her attention.  She responded, "What's the big deal? You make mistakes, I make mistakes."  (Jess Dep. at 115-16, 121-22; Deposition of Rydzak ("Rydzak Dep."), Docket No. 59, Ex. N, pp. 14-15.)  Plaintiff did not agree with her suspension and refused to sign the acknowledging receipt on her suspension letter. (9-17-04 Suspension Letter, Docket No. 59, Ex. M; Walters Dep. at 78-79.)

Rydzak testified that she routinely counseled and disciplined plaintiff on a more informal basis. (Rydzak Dep. at 8-9.)  Rydzak testified that she did not always write plaintiff up for her inadequate job performance.  (Id.)  Instead, she would take plaintiff aside and talk to her about focusing more on her job. (Id.)  Plaintiff denies that prior to her termination she was routinely counseled or informally disciplined by Rydzak. (Walters Aff. ¶ 14.)

In September 2004, Lisa Juskowich ("Juskowich") was hired by the President Judge David Gilmore to work as clerk-typist I in the domestic relations office. (Deposition of Lisa Juskowich ("Juskowich Dep."), Docket No. 59, Ex. O at 6, 10, 22-26.)  Shortly after she began working as a clerk typist I, Juskowich claimed that she had a conversation at the front desk with plaintiff.  (Id. at 25-26.)  During the conversation, plaintiff allegedly talked about her doctor's appointments and made a comment to Juskowich about how medical instruments used during a sonogram can be sexually stimulating.  (Id.)  Plaintiff testified that:

> [Juskowich] said to me, and I remember this distinctly.  She said she had female problems.  I said I had – she had to get a sonogram done.  I said sometimes a sonogram you can't see everything, you have to have an internal sonogram.  Do not quote me on this, but I said something along the lines of oh, you would like it or I liked it or something like that, and that was it.

(Walters Dep. at 94.)

In early October 2004, Juskowich was an enforcement officer in the domestic relations section.  (Juskowich Dep. at 23-24.)  On October 13, 2004, Juskowich was training with Michelle Menozzi ("Menozzi") and was mailing out letters for Menozzi.  (Id. at 55-56.)  In the late afternoon Juskowich ran out of envelopes and Menozzi told her that more envelopes were stored in the cabinet near the front of the office.  (Id.)  Juskowich walked toward the front of the office, past plaintiff's cubicle, but did not see the cabinet.  (Id. at 55-58.)  Juskowich asked plaintiff where the envelopes were located.  (Id. at 58-59.)  According to Juskowich, plaintiff told her where the envelopes were and then began talking about how cold it was in the office.  (Id.)  Plaintiff told Juskowich that her hands were cold and pulled Juskowich's shirt out of her pants and placed both her hands directly on Juskowich's stomach.  (Id.)  Juskowich claims that she jumped back and gasped Karen's name.  (Id.)  Jada Finley, another domestic relations

worker whose cubicle was nearby, overheard Juskowich gasp, "Karen," in a shocked manner. (Deposition of Jada Finley, December 7, 2007 ("Finley Dep."), Docket No. 59, Ex. R at 16-17.)

Juskowich testified that she felt embarrassed and violated and immediately told her coworker, Krista Humphries ("Humphries"), about the incident. (Juskowich Dep. at 58-59, 73.) Humphries reported the incident to Menozzi, and Juskowich reported it to Kresh. (Id. at 58.) Kresh took Juskowich into deputy court administrator Jess' office and they relayed the incident to him. (Id. at 58-59.) In response to the alleged incident, deputy court administrator Jess testified that he asked for assistance from the County human resources office ("HR") in conducting an investigation because HR had expertise in handling sexual harassment complaints. (Jess Dep. at 20-21; Kresh Dep. at 50-51, 61.) Kresh was instructed to participate in the investigation on behalf of the court. (Jess Dep. at 67-68; Kresh Dep. at 58.)

Jess called HR and an equal employment opportunity ("EEO") specialist, Aggie Scarton ("Scarton"), came to Jess' office and gave Juskowich a complaint form to fill out. (Kresh Dep. at 50-51; Discrimination/Harassment Complaint by Juskowich, Docket No. 59, Ex. S.) After Juskowich relayed the incident to Scarton, Juskowich took a break, and Kresh and Scarton discussed the matter in private. (Juskowich Dep. at 58-59; Kresh Dep. at 51.) When Juskowich returned from her break and was signing in, she claimed that plaintiff, whose cubicle was also near the sign-in area, told her that, "my hands were cold weren't they?" (Juskowich Dep. at 59.) Juskowich testified that this comment made her even more upset, and she relayed the comment to Kresh and Jess. They sent her home early. (Id. at 59; Kresh Dep. at 51.)

A few days after the incident, Ryzdak spoke to Jess about plaintiff. Ryzdak remembers saying "I can't believe that she would do that or anybody else, you know, like any other

employee, but I remember saying that, because my issues with [plaintiff] were always work-related, and I couldn't believe that she would turn around and do something like that." (Ryzdak Dep. at 27.) Ryzdak, however, was not involved in any further proceedings involving plaintiff and was not called into HR. (Id. at 26.)

On October 18, 2004, plaintiff was called into a meeting with domestic relations director Kresh, Scarton, and County HR assistant director Urban at which plaintiff was notified about the allegations made by Juskowich and questioned about the incident. Plaintiff's union representative Pete Lorenzo attended this meeting as well. (11-24-04 HR Report, Docket No. 59, Ex. Q (the "HR Report"); Kresh Dep. at 46-49.) At this point, plaintiff was not yet aware of the charges made against her by Juskowich. (Kresh Dep. at 53-54.) Once informed of the allegation made by Juskowich, plaintiff was given the opportunity to explain her side of the story. (Kresh Dep. at 54.) At the October 18, 2004 meeting, plaintiff stated that she had no recollection of Juskowich asking her on October 13, 2004, where the envelopes were located. (Walters Dep. at 93.) At the meeting, plaintiff could not recall whether she told Juskowich her hands were cold. (Id. at 94.) While plaintiff later believed that she probably told Juskowich that her hands were cold, she denied pulling out Juskowich's shirt or placing her hands on Juskowich's stomach. (Pl.'s Answer to the County's Interrogs., Docket No. 59, Ex. U, No. 19.)

At no time during the October 18, 2004 meeting did plaintiff claim that she was being treated unfairly because of her age. (Deposition of Pete Lorenzo ("Lorenzo Dep."), Docket No. 59, Ex. T at 98.) During that meeting plaintiff requested a copy of the EEO complaint form and proceeded to fill out her own complaint against Juskowich, Rydzak, Kresh, and Jess. (HR Discrimination/Harassment Compl. by Pl., Docket No. 59, Ex. V.) Plaintiff's allegations against

these individuals were that they were unfairly treating her. (Walters Dep. at 109-10.) When asked when she was first harassed or discriminated against, plaintiff answered "I always thought I was. 1992." (Id. at 100-01.) When asked about the nature of the discrimination, she stated "to your question of being discriminated against, people repeated everything." (Id.) She thought other employees would comment about her words or actions behind her back. (Id.) The alleged discrimination also related to her personal life, as coworkers would comment about people she dated. (Id. at 102.) In describing the discrimination, plaintiff said "[i]t's just women being catty." (Id.) The discrimination had nothing to do with her age or gender. (Id.) Plaintiff testified at her deposition that the basis for her charge of discrimination in her EEO complaint was her "[g]etting blamed for something [she] didn't do." (Id. at 106-07.)

After hearing plaintiff's side of the story, Kresh suspended plaintiff without pay pending completion of the inquiry. (10-18-04 Suspension Letter, Docket No. 59, Ex. W; Kresh Dep. 57.) Following the October 18, 2004 meeting with plaintiff, HR assistant director Urban and EEO specialist Scarton prepared a memorandum (the "HR Report") summarizing their investigation into the Juskowich incident and plaintiff's response to Juskowich's allegation. (11-12-04 HR Report.) The HR Report stated that the reasons for finding Juskowich's statement credible were plaintiff admitting to a past comment to Juskowich about the use medical instruments as sexual objects, the overhearing of Juskowich gasp "Karen" by Jada Finley, and Juskowich's own visible signs of distress following the incident. (Id.) HR recommended to the Court of Common Pleas that plaintiff be disciplined up to and including termination. (Id.)

On October 20, 2004, plaintiff, through her union representative, filed a discipline grievance with the Court of Common Pleas and the County asserting that her suspension was

without the "just cause" that is required under the collective bargaining agreement to discipline employees. (10-20-04 Discipline Grievance, Docket No. 59, Ex. X.) In her grievance, she also complained about discrimination. (10-18-2004 HR Discrimination/Harassment Compl. by Pl., Ex. V; Walters Dep. at 106.)

In response to plaintiff's filing of the grievance on October 20, 2004, deputy court administrator Jess informed plaintiff and the union that the Court of Common Pleas would not grieve the matter because application of the just cause standard interfered with the court's inherent power to hire, fire, and supervise its employees and was unenforceable. (10-26-04 Letter from Jess, Docket No. 59, Ex. Z.) The County also informed the union, via letter, that it could not grieve plaintiff's suspension because separation of powers' principles precluded it from reviewing court decisions involving the hiring, firing, and supervision of court employees. (2-10-05 Letter from County to Union, Docket No. 59, Ex. AA.)

Plaintiff retained an attorney to help her challenge the suspension. On October 21, 2004, plaintiff's prior counsel sent director Kresh a letter stating that plaintiff's due process rights had been violated because she had been suspended without a proper hearing. (10-21-04 Correspondence from Smith-Delach, Docket No. 59, Ex. BB.) Plaintiff's prior counsel stated that plaintiff's claim concerning the violation of her due process rights was bolstered by the collective bargaining agreement between the County and the union which did not provide for indefinite suspensions without pay. (Id.) In response, labor counsel for the court informed plaintiff's prior counsel that the collective bargaining agreement did not confer upon plaintiff a protected property interest in her judicial employment, because well-settled law holds that collective bargaining agreements do not apply to court employees to the extent that they limit or

12

affect the court's inherent power to hire, fire, and supervise its own employees.  (11-15-04 Correspondence from Palumbo, Docket No. 59, Ex. CC.)

The Court of Common Pleas agreed to have a second meeting with plaintiff on December 3, 2004.  (Id.)  The Court of Common Pleas agreed to convert retroactively plaintiff's suspension without pay to a suspension with pay pending the final outcome of the investigation.  (12-13-04 Memorandum, Docket No. 59, Ex. DD.)  Although the Court of Common Pleas did not have a formal written policy for handling disputes between court employees, the established practice was to allow each party an opportunity to tell their side of the story.  (Jess Dep. at 48-49.)  On December 3, 2004, court administrator Weller had a meeting with plaintiff and her two union representatives, Kris Ring and Pete Lorenzo.  (Walters Dep. at 98-99; 12-7-04 Report of Weller, Docket No. 59, Ex. P.)  At this meeting, plaintiff was again informed of the charges leveled against her by Juskowich.  (Walters Dep. at 99, 123-24.)  Plaintiff was informed that there were two witnesses to the incident, Jada Finley and Humphries, and plaintiff was again given an opportunity to explain herself and what she believed did or did not occur on October 13, 2004.  (Id.; 12-7-04 Report of Weller, Exhibit P.)

Following this meeting, Weller prepared a report and recommendation to Judge O'Dell Seneca.  In her report, Weller stated that based upon her interviews with plaintiff and other witnesses, she believed Juskowich's allegations to be credible.  (12-7-04 Report of Weller, Exhibit P.)  In light of the seriousness of the incident, plus plaintiff's prior disciplinary history, Weller recommended  to Judge O'Dell Seneca that plaintiff's employment with the Court of Common Pleas be terminated.  (Id.)  In addition to considering Weller's report and recommendation and the HR Report, Judge O'Dell Seneca sought input from Kresh and Jess.

Judge O'Dell Seneca asked Kresh to come to her office to discuss the Juskowich incident and Kresh's overall evaluation of plaintiff's job performance. (Kresh Dep. at 47-48.) Kresh told Judge O'Dell Seneca that she felt Juskowich's allegations against plaintiff were credible and that plaintiff's job performance was inadequate. (Id. at 56, 65-67.) Judge O'Dell Seneca asked Kresh what she recommended as a penalty, and Kresh said she felt termination was appropriate. (Id. at 66-67.)

Judge O'Dell Seneca asked for Jess' opinion about the Juskowich incident, as well as plaintiff's overall job performance. (Jess Dep. at 54-55.) Jess recommended to Judge O'Dell Seneca that she terminate plaintiff's employment with the court. (Id.) Based upon HR's investigation, court administrator Weller's investigation, and the eyewitness accounts of the October 13, 2005 incident, Jess believed Juskowich's allegation against plaintiff was credible. (Id. at 57.) He further believed that the Juskowich incident, when combined with plaintiff's lengthy disciplinary history, provided more than sufficient grounds for terminating plaintiff's employment. (Id. at 55.)

Following the December 3, 2004 meeting, Judge O'Dell Seneca took the matter under advisement. Until Judge O'Dell Seneca made a final decision, she continued to keep plaintiff on suspension without pay. (12-13-04 Memorandum, Ex. DD.) In making this decision, Judge O'Dell Seneca relied upon the information contained in the HR Report and court administrator Weller's report and recommendations. (Ct.'s Answer to Pl.'s Interrogs., Docket No. 59, Ex. D, No. 10, 15-19.) Plaintiff's employment was terminated by the Court of Common Pleas on December 27, 2004. (Walters Dep. at 42.) Plaintiff was forty-one years old on the date of her termination. (Id. at 113.) Judge O'Dell Seneca subsequently hired Daisha Bobola to fill the

vacant clerk-typist II position once occupied by plaintiff. (Ct.'s Answer to Pl.'s Interrogs., No. 24.) Bobola was in her mid-twenties. (Walters. Dep. at 113.)

On December 29, 2004, plaintiff and her union filed a discipline grievance seeking to arbitrate the Court of Common Pleas' decision to terminate her on the ground that it was without just cause. (12-29-04 Discipline Grievance, Docket No. 59, Ex. FF.) The Court of Common Pleas refused to entertain plaintiff's grievance stating that the just cause provision did not as a matter of law apply to judicial decisions regarding the hiring, firing, and supervision of court employees. (5-16-05 Letter from County HR, Docket No. 59, Ex. HH.) Since neither the Court of Common Pleas nor the County would arbitrate plaintiff's termination, the union filed a charge of unfair practices with the Pennsylvania Labor Relations Board ("PLRB"). (Deposition of Jim Falorio, Dec. 6, 2007, ("Falorio Dep."), Docket No. 59, Ex. GG at 15-17.) On September 13, 2005, the PLRB notified plaintiff and the union that the decision of the Court of Common Pleas to terminate plaintiff was not arbitrable based upon the information submitted. (9-13-05 PLRB Letter, Docket No 59, Ex. JJ.) The union declined to file exceptions to this decision or take the matter to court. (Falorio Dep. at 65-66; Pennsylvania Human Relations Commission ("PHRC") Compl., Docket No. 59, Exhibit KK.) The union's grievance on behalf of plaintiff was withdrawn. (Walters Dep. at 122.)

Plaintiff, through her current counsel, filed a complaint with the PHRC in May 2005 regarding her termination. (PHRC Compl., Ex. KK; Walters Dep. at 109-110.) On August 9, 2005, the PHRC dismissed plaintiff's complaint because it was barred by separation of powers' principles from asserting jurisdiction over the hiring and firing decisions of the Pennsylvania

judiciary.  (8-9-05 Letter from PHRC, Docket No. 59, Ex. LL.)  On October 10, 2006, plaintiff filed the instant federal employment discrimination case.

The first time plaintiff believed she was discriminated against based upon her age was October 2004, when "they started hiring younger and younger people."  (Walters Dep. at 108.) At the time she filed her October 18, 2004 EEO complaint with HR, she did not allege that she was discriminated against because of her age.  (Id. at 108.)  Plaintiff claimed that coworkers Bob Abrams, Martha Ward, Jada Finley, April Plant, and Joe "whatever his last name was that was in the docket room" told her there was a conspiracy to set her up.  (Id. at 116.)  Plaintiff alleged that Bob Abrams told her this after her employment was terminated.  (Id.)


**Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).

The nonmoving party must point to specific affirmative evidence in the record, rather than rely upon conclusory or vague allegations or statements.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Concrete evidence must be provided for each element of each of the claims, and the evidence must be such that a reasonable fact-finder could find in that party's favor at trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  "A nonmoving party, like plaintiff, must 'designate specific facts showing that there is a genuine issue for trial.'"  Orenge

v. Veneman, No. 04-297, 2006 WL 2711651, at *6 (W.D. Pa. Sept. 20, 2006) (citing Celotex, 477 U.S. at 324).

A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson, 477 U.S. at 248. In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 249. The court may consider any evidence that would be admissible at trial in deciding the merits of a motion for summary judgment. Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993); Pollack v. City of Newark, 147 F. Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1957) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").

## Analysis

The County, Kresh, Rydzak, and Jess contend that plaintiff was not an employee of the County and, therefore, improperly named them as defendants in this suit. The Judicial Defendants argue that they are entitled to Eleventh Amendment immunity from suit for the decision to fire plaintiff and are not "persons" who can be sued under 42 U.S.C. § 1983. All defendants argue that plaintiff was an at-will employee and enjoyed no property interest in her job. Alternatively, they argue that plaintiff received all process she was due. All defendants argue that if plaintiff was in fact an employee and no immunity existed, they had a legitimate, nondiscriminatory reason for firing plaintiff. Finally, they argue that summary judgment must

be granted on plaintiff's state law claim for wrongful discharge based upon public policy because plaintiff failed to point to any source supporting her claim.

## I.        *Co-employment status of County*

In Pennsylvania, the courts are the employers of judicial personnel.  See Graves v. Lowery, 117 F.3d 723, 727 (3d Cir. 1997).  The domestic relations section is a statutorily prescribed division of the Court of Common Pleas, and is not a County agency.  42 PA. CONS. STAT. § 961.  In instances where the state trial court and the county both exercise significant control over the same employees, the county may be considered a co-employer with the court. Graves, 117 F.3d at 727.  Plaintiff does not dispute that she worked for the Court of Common Pleas, more specifically, the domestic relations section.  Plaintiff, however, argues that the County was her co-employer for several reasons: 1) the County had input into the hiring process that led to the hiring of plaintiff; 2) plaintiff believed that she was covered by the County's sexual harassment policy and personnel policies; 3) plaintiff believed that she was a County employee; 4) the County investigated Juskowich's allegations of sexual harassment; 5) County personnel forms were used by the Court of Common Pleas in processing personnel actions; 6) plaintiff's personnel file and identification card were controlled by the County; 7) plaintiff was compensated by the County; and 8) the County had a role in plaintiff's termination.

It is well established that if a plaintiff is not an employee of a defendant, then that plaintiff may not assert a claim against the defendant under the employment discrimination statutes.  EEOC v. Zippo, 713 F.2d 32, 35 (3d Cir. 1983).  The standard for determining employee status under the federal discrimination statues is a hybrid test combining the common law "right to control" test with the "economic realities" test as applied in Title VII cases.  Id. at

38. Under the standard set forth in <u>Zippo</u>, the court "looks at the economic realities of the situation but focuses on the employer's right to control the employee" to determine employee status. <u>Id.</u> at 37. "[T]he extent of the employer's right to control the 'means and manner' of the worker's performance is the most important factor." <u>Id.</u>

In <u>Graves</u>, the United States Court of Appeals for the Third Circuit took up the question whether seven clerks, "who are formally considered employees of the judicial branch of the Commonwealth of Pennsylvania," were precluded from bringing a federal employment discrimination claim against Dauphin County. <u>Graves</u>, 117 F.3d at 724. The clerks in question had worked under a district justice, who allegedly sexually harassed several female clerks. <u>Id.</u> at 725. The district justice's sexual harassment was reported by the women to the office manager and after an investigation, the manager determined that the clerks' claims had merit. <u>Id.</u> The office manager along with the clerks submitted a complaint to the Dauphin County court administrator, and an investigatory panel was convened which was chaired by the county's chief clerk. <u>Id.</u> Dauphin County also made counseling sessions available to the clerks. <u>Id.</u> Soon after the investigation, the district justice notified Dauphin County about his decision to terminate two of the complaining employees. The county, however, refused to effectuate the firings. <u>Id.</u> The district justice preceded to take a number of further retaliatory actions. <u>Id.</u>

Two employees who were terminated filed suit in the United States District Court of the Middle District of Pennsylvania against the district justice and Dauphin County claiming that the county's funding of their positions was sufficient to impose employer status on the county. <u>Id.</u> (citing <u>LeGrand v. Lowery</u>, No. CV-93-1980 (M.D. Pa. May 3, 1994), <u>aff'd</u> 65 F.3d 162 (3d Cir. 1995) (unpublished table decision). In the <u>LeGrand</u> case filed in Middle District of

Pennsylvania, the district court dismissed the complaint against Dauphin County holding that the judiciary was defined by state law as the employer of judicial personnel and that Dauphin County could not be considered the employer of the two employees who had been fired. The district justice was found individually liable by a jury under 42 U.S.C. § 1983. Id.

In Graves, the seven clerks (who were not the plaintiffs in the LeGrand case) filed a Title VII action against the district justice, the Pennsylvania Supreme Court, and Dauphin County, alleging that Dauphin County was the co-employer of the clerks. Id. at 726. The district court granted Dauphin County's motion to dismiss for failure to state a claim upon which relief could be granted. Id. The plaintiffs appealed.

In determining the status of Dauphin County, the United States Court of Appeals for the Third Circuit recognized that the determination of a joint employer relationship was factually based. Id. at 729. The court of appeals concluded that even though the § 1983 claim against Dauphin County had been dismissed in LeGrand, the Title VII claim could go forward in Graves based upon the differences in the facts alleged in the separate complaints filed by the different plaintiffs. Id. at 728. The court of appeals in Graves found significant that two of the plaintiffs were hired by county officials to work in the magisterial district, the clerks were covered by the county's sexual harassment policy, the clerks understood that they were covered by the policy, Dauphin County convened an investigative panel, the county provided counseling services, the clerks were allegedly covered by the county's personnel policies, the clerks were allegedly told they were county employees, and the clerks were subject to termination or reinstatement by the county. Id. at 728-29.

Plaintiff claims that the factual scenario in her case is similar to that of the clerks in Graves and that here there is sufficient evidence the County was a joint employer with the Court of Common Pleas. The parties do not contest that plaintiff was paid by the County, and plaintiff provided documentation that she filled out County paperwork for employment in the Court of Common Pleas' domestic relations section and filled out an authorization for the County to complete a criminal record check. County employment and training documentation exists for plaintiff dating from 1992. Plaintiff signed an acknowledgment that she had been informed about various County policies, and in her affidavit she asserted her belief that her position was covered by the policies. Kresh testified that she referred plaintiff to the County's employee assistance program. Both parties agree that the facts surrounding plaintiff's firing were investigated by the County's HR department, which later furnished a report to Judge O'Dell Seneca.

Plaintiff also believed she was covered by the collective bargaining agreement to which the County was a party. Plaintiff points to the testimony of Kresh, attesting to the practice of telling her employees that they could bring a union representative to meetings regarding discipline or counseling. Plaintiff points to the testimony of Jess stating that domestic relations employees were afforded the right to union representation when being disciplined or otherwise accused of wrongdoing, that the union regularly filed grievances on behalf of "court" employees under his supervision, and that Jess had heard that prior to his tenure as deputy court administrator, the Court of Common Pleas participated in the grievance process. Defendants' claim that only County employees were entitled to grieve disciplinary action.

Consistent with the <u>Graves</u> decision, plaintiff being paid by the County is insufficient to impose co-employer status on it. Even if plaintiff was covered by the collective bargaining agreement with regard to her wage rates and benefits, these issues deal strictly with plaintiff's pay and would not interfere with the Court of Common Pleas' sole right to hire or fire. <u>See Beckert v. AFSCME</u>, 425 A.2d 859, 862-63 (Pa. Commw. Ct. 1981) (holding that the discharge of a judicial employee is a judicial power vested by the Pennsylvania Constitution in the courts, and, although judicial employees may organize and bargain collectively with respect to financial terms of employment, the employees are still subject to the courts' inherent power to discharge). Plaintiff admitted that Rydzak and Kresh controlled plaintiff's day-to-day work activities, and admitted that Rydzak told plaintiff what her hours were and set the guidelines, policies, and practices of plaintiff's employment. Plaintiff's superiors in the domestic relations section were also responsible for disciplinary action.

Plaintiff's other evidence, however, suggests that the County had some role in hiring, supervising, and terminating plaintiff. Plaintiff being required to sign multiple personnel acknowledgments for County personnel policies creates an inference of control over plaintiff. There is evidence, through the County application process and the participation of the County HR department in investigating employment problems with plaintiff, that the County had input into the hiring and firing of plaintiff. Although Judge O'Dell Seneca ultimately made the final determination to fire plaintiff, it was based, in part, on the HR Report, which was a report and recommendation from the County. The records support that plaintiff, and other employees, believed they were entitled to participate in the County's grievance procedure through the union.

Considering the record as a whole, the court finds that plaintiff provided sufficient evidence to survive summary judgment on the issue of joint employer status of the County.

## II.     *Judicial Defendants as proper defendants under the ADEA*

The Judicial Defendants claim, with regard to their being sued in this case, that they are entitled to Eleventh Amendment immunity for all claims under the ADEA.  The Eleventh Amendment of the United States Constitution provides that:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against any one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI.  The Supreme Court has also interpreted the Eleventh Amendment to bar suits against a state by its own citizens, unless the state consents and thus waives immunity. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984).  The bar operates when the state is the party named, and when "the state is the real, substantial party in interest."  Edelman v. Jordan, 415 U.S. 651, 663 (1974).

To be afforded Eleventh Amendment immunity, the Court of Common Pleas would need to be considered an agency, instrumentality, or arm of the state.  See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 279-81 (1977).  The Pennsylvania Constitution, article V, section 1 provides:

> The judicial power of the Commonwealth shall be vested in a unified judicial system consisting of the Supreme Court, . . . [and] courts of common pleas . . . .  All courts . . . shall be in this unified judicial system.

PA. CONST. art. V, § 1.  In addition, the "commonwealth government" is defined as including "the courts and other offices and agencies of the unified judicial system . . . ."  42 PA. CONS.

STAT. § 102. As the Domestic Relations Office is a statutory part of the Court of Common

Pleas, it is an office of the unified judicial system. See 42 PA. CONS. STAT. § 961 ("Each court

of common pleas shall have a domestic relations section, which shall consist of such probation

officers and other staff of the court as shall be assigned thereto."). It qualifies as a state entity.

The Court of Common Pleas, the Domestics Relations Office, and Judge O'Dell Seneca

in her official capacity are entitled to Eleventh Amendment immunity. See Pokrandt v. Shields,

773 F. Supp. 758, 764-65 (E.D. Pa. 1991); cf. Reiff v. Philadelphia County Court of Common

Pleas, 827 F. Supp. 319, 323 (E.D. Pa. 1993); Teamsters Local 115 v. Pa. Labor Relations Bd.,

619 A.2d 382, 384-85 (Pa. Commw. Ct. 1992). For the Judicial Defendants to be proper

defendants in this action, with the exception of Judge O'Dell Seneca in her individual capacity,

there must have been a waiver of immunity by the state or an abrogation of Eleventh

Amendment immunity by Congress. The Commonwealth of Pennsylvania has not waived its

Eleventh Amendment immunity to suit. Pennsylvania has specifically withheld consent

pursuant to statute:

> Federal courts. Nothing contained in this subchapter shall be
> construed to waive the immunity of the Commonwealth from suit
> in Federal courts guaranteed by the Eleventh Amendment to the
> Constitution of the United States.

42 PA. CONS. STAT. § 8521(b); see Laskaris v. Thornburgh, 661 F.2d 23, 25 (3d Cir. 1981).

The only avenue open to plaintiff under the ADEA would be if Congress had specifically

intended to abrogate the states' Eleventh Amendment immunity from suit using its Fourteenth

Amendment legislative powers. In Kimel v. Florida Board of Regents, 528 U.S. 62, 82-92

(2000), the Supreme Court addressed the issue whether the ADEA validly abrogated the states'

Eleventh Amendment immunity from suit by private individuals, and found that it did not. The

claims under the ADEA against the Court of Common Pleas, the Domestic Relations Office, and Judge O'Dell Seneca in her official capacity must be dismissed due to their being immune from suit under the Eleventh Amendment.

With respect to the claims against Judge O'Dell Seneca in her individual capacity, plaintiff did not allege that Judge O'Dell Seneca was an employer of plaintiff within the meaning of the ADEA and those claims must be dismissed.  See Hill v. Borough of Kutztown, 455 F.3d 225, 233-34 (3d Cir. 2006) (noting that the plaintiff could not bring an ADEA claim against the mayor even though the mayor made the decision to terminate the plaintiff, because the ADEA does not provide for individual liability); Sheridan v. E.I. Dupont de Memours and Co., 100 F.3d 1061, 1078 (3d Cir. 1996) (holding that Title VII does not impose liability upon individuals who are not an employing entity).

### III.    *Age discrimination – elements of claims and legal framework*

The ADEA prohibits an employer from discriminating against any employee on the basis of the employee's age if the employee is over forty years old, and the PHRA provides likewise.[2] 29 U.S.C. §§ 623(a), 631(a); 43 PA. CONS. STAT. §§ 954(h), 955(a).  Here, plaintiff did not adduce direct evidence of age discrimination.  In cases where there is no direct evidence of discrimination, the United States Court of Appeals for the Third Circuit applies the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Barber v. CSX Distrib. Servs., 68 F.3d 694 (3d Cir. 1995).  Under this analysis, a plaintiff must first establish a prima facie case of discrimination.  McDonnell Douglas, 411 U.S. at 802; Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54 (1981).  If the plaintiff successfully

---

2    The standards under the ADEA and the PHRA are the same and will therefore be decided and discussed together. See Kautz v. Met-Pro Corp., 412 F.3d 463, 465 (3d Cir. 2005).

demonstrates a prima facie case of discrimination, the burden of production, but not the burden of persuasion, shifts to the defendants to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644 n.5 (3d Cir. 1998). The defendants can satisfy this burden by offering evidence of a nondiscriminatory reason for their action. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). Once the defendants offer a legitimate nondiscriminatory reason for the challenged conduct, the plaintiff has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendants were not their true reasons, but were pretext for discrimination. Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999).

### A. *Prima facie case*

To establish a prima facie case, the plaintiff must show that 1) she is age forty or older; 2) her job performance met the employer's legitimate expectations; 3) she was terminated from her position; and 4) she was replaced by a sufficiently younger person or a younger, similarly situated employee. Simpson, 142 F.3d at 644 n.5. Here, defendants are willing to concede for purposes of this motion that plaintiff met her prima facie case requirements. Plaintiff was over forty at the time of her termination, her job performance met the employer's legitimate expectations, and she was terminated from her position on December 27, 2004. With regard to the fourth factor, plaintiff showed that a younger employee was hired to replace her after plaintiff was terminated.

### B. *Defendants' showing of legitimate, nondiscriminatory reason*

Once plaintiff successfully adduced sufficient evidence to establish a prima facie case for age discrimination, the burden shifts to defendants to articulate a legitimate, nondiscriminatory

reason for plaintiff's termination.  See Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997).  The burden on defendants at this junction is "relatively light," and can be satisfied "by introducing evidence which, *taken as true*, would permit the conclusion that there was a non-discriminatory reason for [plaintiff's termination]. . . ."  Fuentes, 32 F.3d at 763 (emphasis added) (citations omitted).  Defendants' stated legitimate, nondiscriminatory reasons for terminating plaintiff were that she violated its sexual harassment policy and that she had a lengthy disciplinary history.  With respect to the policy violation, defendants conducted a thorough inquiry into the Juskowich incident.  Both HR and Weller conducted separate investigations, both found Juskowich's allegation to be credible, and both recommended that termination of plaintiff's employment was proper.  Considering defendants' burden is light and their evidence must be taken as true, the court is satisfied that defendants set forth legitimate, nondiscriminatory reasons for plaintiff's termination and met their burden of production.

### C. Pretext

The final issue that the court must address with respect to summary judgment in this case is the last part of the McDonnell-Douglas framework: whether plaintiff can demonstrate that defendants' stated reasons for her termination were a pretext for age discrimination.  The United States Court of Appeals for the Third Circuit has developed the following two-prong test (the "Fuentes test") that a plaintiff must meet to show pretext:

> [T]o defeat summary judgment when the [employer] [articulates] legitimate non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Fuentes, 32 F.3d at 764; see Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 370 (3d Cir. 2008) ("Put another way, to avoid summary judgment the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact-finder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, that the proffered reason is a pretext)."). The two prongs of the Fuentes test are distinct. The court will analyze both prongs of the Fuentes test to determine whether sufficient evidence was presented by plaintiff to defeat defendant's motion for summary judgment. See Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108-13 (3d Cir. 1997) (analyzing ADEA action under both prongs of Fuentes framework).

### 1. Prong one of *Fuentes* test

Prong one of the Fuentes test focuses on whether plaintiff submitted evidence from which a fact-finder could reasonably disbelieve the defendants' articulated legitimate reasons for the plaintiff's termination. Under this prong, the plaintiff must point to:

> weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them "unworthy of credence" and hence infer that the proffered nondiscriminatory reason "did not actually motivate" the employer's action.

Simpson, 142 F.3d at 644. The district court under this prong must focus on the legitimate, non-discriminatory reason offered by the employer. Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992) (stating that a "plaintiff does not establish pretext, however, by pointing to criticisms of members of the non-protected class, or commendation of the plaintiff, in categories the defendant says it did not rely upon . . . ."). The court is neither permitted to get

involved in the subjective business decisions of the employer, nor set its own employment standards for the employer, unless there is evidence of discrimination. Id. at 527.

Cases analyzed under this prong usually survive a motion for summary judgment when the employer's stated reason for termination is so implausible that a reasonable fact-finder could not believe it. For example, in Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326 (3d Cir. 1995), the plaintiff was terminated for deficient sales performance. The evidence of record, however, disclosed that the plaintiff received a bonus three months before he was fired and that he was the only sales representative in the region who had received such a bonus. Id. at 329. The court held that, where the primary measure of the plaintiff's performance was sales and he was the leading salesperson in the region, his employer's stated reason for his termination was contradictory to its admission that the most important standard of job performance is sales. Id. at 332. According to the court, "[a] fact-finder could find it implausible that [the employer] would have fired [the plaintiff] for such deficiencies when he was successful in the sole area identified by [the employer]'s own performance incentive program - sales." Id.

Similarly, in Sempier v. Johnson and Higgins, 45 F.3d 724 (3d Cir. 1995), the employer stated that Sempier was terminated based upon poor performance that caused the company to restructure the nature of his responsibilities. The evidence of record, however, disclosed that 1) Sempier never received any unfavorable criticism that his performance was poor or inadequate; and 2) the employer failed to produce any other evidence of poor performance or to make specific allegations of Sempier's deficiencies. Id. at 731-33. Thus, there was evidence on the record that a reasonable fact-finder could conclude that the reason given by Sempier's employer was a pretext for age discrimination. Id. at 732-33.

With respect to evidence of pretext, plaintiff points to her affidavit and deposition testimony, in which she denies or states that she does not recall any of the alleged incidents of wrongdoing.

It is not the function of this court to determine whether defendants' business judgment in terminating plaintiff was correct. In <u>Watson v. Southeastern Pennsylvania Transportation Authority</u>, 207 F.3d 207 (3d Cir. 2000), the Court of Appeals for the Third Circuit explained that an employer is permitted "to take an adverse employment action for a reason that is not 'true' in the sense that it is not objectively correct." <u>Id.</u> at 222. As an example, the court of appeals stated:

> if an employer sincerely believes that an employee has stolen company funds and discharges the employee for this reason, the employer should not be held liable under the [employment discrimination statutes in question] just because it turns out that the employee did not steal the funds and that the employer's reason for the discharge was in this sense not "true."

<u>Id.</u> It follows that plaintiff's argument that the alleged incidents did not occur is irrelevant. Rather, the inquiry must focus upon "the perception of the decision maker." <u>Billet v. Cigna Corp.</u>, 940 F.2d 812, 825 (3d Cir. 1991). Defendants only needed an honest belief that the incidents occurred. <u>Watson</u>, 207 F.3d at 222.

Plaintiff admits that she was given a verbal warning as early as 1993 and was suspended for the first time in 1995, and then a second time in 1999. These incidents were dealt with by two separate individuals who were no longer in the director and deputy director positions at the courthouse by the time of the alleged Juskowich incident. Additionally, plaintiff admits that in 2004 Kresh counseled her on her attendance and phone use, reprimanded her, and suspended her for insubordination and failure to perform sufficiently her job duties. Although plaintiff disputes

the underlying incidents that resulted in her prior discipline, she admits that disciplinary action was taken, and she does not demonstrate that reliance on her disciplinary record was pretext. She offers no evidence that defendants did not hold an honest belief that her record demonstrated a history of wrongdoing.

Besides her undisputed history of being disciplined for workplace misconduct, defendants rely heavily upon plaintiff's alleged incident with Juskowich for the decision to terminate her employment. Plaintiff denies that she physically contacted Juskowich in the manner alleged. Plaintiff was reprimanded and eventually terminated following the investigation of the Juskowich incident. The only evidence provided by plaintiff to show that defendant did not hold a genuine belief that the Juskowich incident occurred was (1) her own denials, (2) Ryzdak's admission to Jess that she did not think plaintiff would do the alleged act, and (3) statements by coworkers telling her she was set up. Although Ryzdak was plaintiff's supervisor, however, she was not involved in defendants' decision to terminate plaintiff. Ryzdak made the statement to Jess, and Jess made his recommendation to terminate plaintiff because he found other evidence more convincing than Ryzdak's statement and plaintiff's own version of the events that transpired. Plaintiff offered no evidence that this finding by Jess was not sincere or in good faith. With respect to the statements of plaintiff's coworkers who allegedly told plaintiff she was set up, plaintiff has not provided any details of the statements. None of the coworkers were decision makers, and the coworkers' opinions do not show whether defendants' truly believed plaintiff committed the act of misconduct. Furthermore, the statements are inadmissible hearsay, which cannot create a factual issue as to pretext. See EEOC v. MCI Int'l, Inc., 829 F. Supp. 1438, 1458 (D.N.J. 1993).

Under these circumstances, the court concludes that a reasonable fact-finder could not conclude that the defendant's legitimate nondiscriminatory reason for terminating plaintiff's employment was pretextual under the first prong of the Fuentes test.

### 2. Prong two of *Fuentes* test

The court is next required to examine the second prong of the Fuentes framework to determine if plaintiff presented sufficient evidence of pretext. This prong permits the plaintiff to survive summary judgment if he can demonstrate, through evidence of record, that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes, 32 F.3d at 762. With respect to this prong, the United States Court of Appeals for the Third Circuit has stated:

> To show that discrimination was more likely than not a cause for the employer's action, the plaintiff must point to evidence with *sufficient probative force* that a factfinder could conclude by a preponderance of the evidence that age was a motivating or determinative factor in the employment decision.

Simpson, 142 F.3d at 644-45 (3d Cir. 1998) (emphasis added). The kinds of evidence relied upon by the court of appeals under this prong of the Fuentes analysis are: 1) whether the employer previously discriminated against the plaintiff; 2) whether the employer has discriminated against other persons within the plaintiff's protected class or within another protected class; and 3) whether the employer has treated more favorably similarly situated persons not within the protected class. Id. The court will examine whether plaintiff submitted that kind of evidence.

### a. Evidence of previous discrimination against plaintiff

Plaintiff argues that many individuals at work, including several defendants, discriminated against her. She alleges this discrimination started almost immediately after she began her employment in 1992. In describing the nature of this supposed discrimination, plaintiff claimed "people repeated everything," made comments behind her back when she was not present, made comments on her personal relationships, and engaged in other types of "catty" behavior. (Walters Dep. at 101-02.) Plaintiff, however, failed to allege any specific statements or actions that could infer an age-based animus. She admitted that the remarks did not reflect age discrimination; the alleged discriminatory behavior began when plaintiff would have been in her late-twenties and early-thirties. Plaintiff may have "felt excluded by her coworkers or unsupported by her managers," but "social unpleasantries . . . cannot give rise to an inference of unlawful discrimination where not one single [age]-based comment is alleged and there is no logical inference that the comments made were, in fact, [age]-based." Williams-McCoy v. Starz Encore Group, No. 02-5125, 2004 WL 356198, at *8 (E.D. Pa. Feb. 5, 2004).

Plaintiff testified that her basis for believing that she was discriminated against because of her age was the hiring of "younger and younger" people beginning in October 2004. Accordingly, the only action against plaintiff that could be considered age discrimination was the termination of her employment in 2004 and the hiring of a younger employee to replace her. This action is the basis of plaintiff's age discrimination claim, and is not evidence of *previous* discrimination. No reasonable finder of fact could conclude from such evidence that defendants previously discriminated against her.

### b. Whether the employer discriminated against other persons in plaintiff's protected class or another protected class

Plaintiff did not present any evidence that defendants discriminated against other persons within plaintiff's protected class. Plaintiff did not establish that people in the protected age category were treated differently than similarly situated younger employees. Although plaintiff claims defendants began hiring "younger and younger" employees, she presented no evidence that older individuals applied for those positions or were qualified for those positions. She did not offer any evidence that these actions by defendants amounted to discrimination against others within the protected class. Moreover, plaintiff did not adduce evidence that defendants discriminated against individuals in other protected classes.

### c. Whether employer treated more favorably similarly situated persons not within the protected class

Plaintiff did not present any evidence that defendants more favorably treated similarly situated persons not within the protected class. Again, plaintiff bases her age discrimination claim upon defendant's hiring of "younger and younger" employees. Plaintiff failed to demonstrate, however, that the younger individuals were similarly situated. There is no evidence with respect to the qualifications of the individuals hired. Under those circumstances, no reasonable fact-finder could determine that defendants more favorably treated similarly situated persons not within the protected age class.

The court concludes the no reasonable jury could render a verdict for plaintiff on her ADEA claims and summary judgment must be granted in favor of defendants.

### IV.    Civil Rights Claims

#### A. Judicial Defendants as Proper Defendants

As was discussed above, the Court of Common Pleas, the Domestic Relations Office, and Judge O'Dell Seneca in her official capacity are arms of the state and entitled to Eleventh Amendment immunity from suit. Plaintiff claims that Congress has abrogated that immunity in the instance of Judge O'Dell Seneca in her individual capacity through the passage of § 1983. To be a proper defendant under § 1983 an individual must allege that a "person" committed a violation. Any individual sued in their official capacity cannot be a "person" under § 1983 and therefore, cannot be held liable under that statute. Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). Additionally, the Court of Common Pleas and the Domestic Relations Office are not "persons" who may be sued under § 1983. Callahan v. City of Philadelphia, 207 F.3d 668, 670-73 (3d Cir. 2000) (holding that the Warrant Division and Eviction Unit of the Court of Common Pleas and Municipal Court Eviction Unit of the First Judicial District are state government entities which are not "persons" under 42 U.S.C. §1983).

Plaintiff's main argument centers around Judge O'Dell Seneca in her individual capacity. In Hafer v. Melo, 502 U.S. 201 (1991), discharged employees of the Commonwealth brought actions under § 1983 against Pennsylvania's Auditor General, who at the time was Hafer. Id. at 23. Hafer was sued in both her official capacity and her individual capacity. Id. The Supreme Court held that state officials sued in their individual capacities are "persons" for purposes of § 1983. Id. at 31. Since Judge O'Dell Seneca is a state court judge, this court does not find sufficient differences between her position and that of any other "state official." Therefore, while the § 1983 claims will be dismissed against the Court of Common Pleas, the Domestic

Relations Office, and Judge O'Dell Seneca in her official capacity, the claims against Judge

O'Dell Seneca in her individual capacity will be discussed below.

### B. Property Interest in Position

Plaintiff claims under § 1983 that she was denied her pre-deprivation and post-

deprivation procedural due process rights through the failure to provide an adequate termination

hearing.

> To state a claim under § 1983 for deprivation of procedural due
> process rights, a plaintiff must allege that (1) he [or she] was
> deprived on an individual interest that is encompassed within the
> Fourteenth Amendment's protection of "life, liberty, or property,"
> and (2) the procedures available to him [or her] did not provide
> "due process of law."

Hill, 455 F.3d at 233-34. In the instant case, the remaining defendants allege that plaintiff did

not have a property interest in her job as a clerk-typist II and, therefore, was not entitled to a

termination hearing.

"'To have a property interest in a job . . . a person must have more than a unilateral

expectation of employment; rather, she must have a legitimate entitlement to such continued

employment.'" Hill, 455 F.3d at 234 (quoting Elmore v. Cleary, 399 F.3d 279, 282 (3d Cir.

2005). Arnett v. Kennedy, 416 U.S. 134, 165 (1974); Curry v. Pa. Turnpike Com'n, 843 F.

Supp. 988, 990 (E.D. Pa. 1994). State law governs whether a property interest exists. Curry,

843 F. Supp. at 990. Plaintiff alleges that a "just cause" provision in the collective bargaining

agreement between the County and the local union and its members grants her a protected

property interest in her court employment. As discussed above, plaintiff was provided with a

union representative at meeting to discuss discipline and discharge and this practice was

consistently followed. This court found that there is sufficient evidence for a jury to conclude

that the County could be a co-employer with the Court of Common Pleas. It was not disputed that plaintiff was a member of the union.

In Pennsylvania, a public employer such as the County can only create a property interest in employment where there is a grant of legislative authority to do so. See Scott v. Philadelphia Parking Auth., 166 A.2d 278 (Pa. 1961) (holding that the Philadelphia Parking Authority could not enter a three-year employment contract, because the legislature did not grant it the power to confer tenure); Bolduc v. Bd. of Supervisors, 618 A.2d 1188, 1190 (Pa. Commw. Ct. 1992). In this case, a grant of authority can be found in the Public Employee Relations Act ("PERA"), 43 PA. CONS. STAT. §§ 1101.101 et seq., which authorizes and regulates collective bargaining between public employers and employees. It is now well settled in Pennsylvania that the PERA authorizes public employers to enter into collective bargaining agreements containing "for-cause" provisions and other limitations on the ability to dismiss summarily employees. See Bd. of Educ. v. Philadelphia Fed'n of Teachers, 346 A.2d 35, 38 (Pa. 1975).

As a result, the provisions in the collective bargaining agreement that are relied upon by plaintiff must be examined. First, plaintiff cites to article VI entitled "Seniority-Probation Period," section 1(c), which should appear on page seven of the document. Plaintiff, however, did include this page of the collective bargaining agreement in Exhibit B. Plaintiff also cites to article XVIII, section 1 of the collective bargaining agreement, which should appear on page thirty-seven of the document. Plaintiff, however, did not include this page of the collective bargaining agreement in Exhibit B. Finally, plaintiff cites to article X, section 3(B), which provides:

> Any employee in Administrative Units 3, 4, and 5 who is
> scheduled for a layoff shall have the right to exercise his seniority

> and bump the least senior employee who holds the same job classification in his department or office.  In the event the senior employee cannot bump within the same job classification, he may bump the least senior employee within the same pay grade within the department or office.  In the event the senior employee cannot bump within the same pay grade, he may bump the least senior employee in the next lowest pay grade.  In the event an employee is unable to bump in that pay grade, the employee may bump in the next lower pay grade.  This bumping procedure shall continue in descending order by pay grade within said administrative units. Any employee who exercises his right to bump must have requisite qualifications, skills and ability to do the job.

(Agreement between County of Washington and Service Employees International Union and Services Employees International Union, Docket No. 68, Ex. B at 20.)  Despite plaintiff's argument to the contrary, this provision of the collective bargaining agreement does not create a property interest in her job.  While it deals with seniority in the context of layoff, this provision does not suggest that plaintiff cannot be fired for any reason whatsoever, as a layoff is not the same type of employment action as the termination or cause in this case.  Since plaintiff failed to provide sufficient evidence of a property interest in her position, there is no need to analyze whether the remaining defendants afforded plaintiff adequate due process of law.  Therefore, plaintiff's claims with regard to due process are dismissed.

## V.   *Retaliatory Suspension and PHRA Claims*

All the federal claims in this case are being dismissed.  Plaintiff makes two further claims under Pennsylvania laws at counts II and IV for age discrimination under the PHRA and retaliatory suspension/discharge under the Pennsylvania Constitution.  These claims are the only remaining claims and contemplate state law issues, i.e., county employment, jurisdiction of the PHRC over the Judicial Defendants, the status of defendants in their individual capacities, age discrimination under the PHRA, and retaliatory suspension/discharge under the Pennsylvania

Constitution. Those state claims are before this court only due to supplementary jurisdiction. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."). "[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995). This court declines to exercise supplementary jurisdiction over the state court claims in this action. The state law claims will be dismissed without prejudice to the plaintiff's right to file the state law claims in state court.

## Conclusion

After reviewing the undisputed material facts of record, viewing all disputed facts in the light favorable to the nonmoving party, and drawing all reasonable inferences in favor of the nonmoving party, the court concludes that the motions for summary judgment filed by defendants will be GRANTED with respect to plaintiff's claims for age discrimination under the ADEA and for deprivation of due process under 42 U.S.C. § 1983. The court declines to exercise supplemental jurisdiction over plaintiff's claims arising under Pennsylvania law, and those claims are dismissed, without prejudice.

By the court:

  /s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

Dated: March 23, 2009